1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11  TAREK HAMDI,                    )    Case No. EDCV 10-894 VAP (DTBx)
                                    )
12                 Petitioner,      )    FINDINGS OF FACT &
                                    )    CONCLUSIONS OF LAW
13        v.                        )    [FED. R. CIV. P. 52]
                                    )
14  UNITED STATES CITIZENSHIP       )
    AND IMMIGRATION                 )
15  SERVICES, et al.,               )
                                    )
16                 Respondents.     )
    _____ )
17

18

19        United States Citizenship and Immigration Services ("USCIS") denied

20  Tarek Hamdi's application for naturalization, and he petitioned this Court for

21  review.  The matter was tried to the Court on February 1 and 2, 2012, and the

22  Court then took the matter under submission.[1]  Having considered all the

23  evidence admitted at trial, the arguments of counsel, and the briefing

24  submitted by the parties, the Court GRANTS the Petition, issues the following

25

26  _____

27        [1]On February 2, 2012, Petitioner filed a Request for Judicial Notice,
    asking the Court to take judicial notice of eight items.  Respondents' counsel
28  had no objection as to item numbers 7 and 8 of the Request, but objected to
    item numbers 1 through 3 as irrelevant and 4 through 6 as cumulative.  The
    Court overrules the objections.  See Fed. R. Evid. 201.

Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52, and issues its decision below.

## FINDINGS OF FACT[2]

1. Petitioner Tarek Hamdi ("Petitioner") is a natural born citizen of Egypt. Am. Joint Pretrial Conference Order ("PTCO") ¶ 5 ("Admitted Facts") (1).

2. Petitioner entered the United States in 1977 on a student visa. Id. He studied civil engineering at several colleges and universities, including Northeastern University, where he met Linda Carriere in 1979.

3. Ms. Carriere is a natural born United States citizen. PTCO ¶ 5(2). She and Petitioner married in 1987. Id. They have four daughters, all born in the United States and hence U.S. citizens. PTCO ¶ 5(3).

### A.   Proceedings

4. Petitioner applied for Lawful Permanent Resident status in 1988, and his application was granted on May 16, 1988. PTCO ¶ 5(5)-(6). He has been a lawful permanent resident since that date. PTCO ¶ 5(7). Petitioner has returned to Egypt only twice since 1977.

5. Petitioner first filed a naturalization application in 2001; his application was approved by the Immigration and Naturalization Service. PTCO ¶ 5(1)-(3). On March 15, 2003, the USCIS notified Petitioner it had reopened his case, and on February 23, 2006, scheduled a naturalization interview for March 10, 2006. PTCO ¶ 5(5)-(6).

---

[2] To the extent any of the Findings of Fact should more properly be considered Conclusions of Law, they shall be deemed as such.

6.   Petitioner did not appear at the March 10, 2006, interview because he did not receive the notice, and the USCIS denied his naturalization application for failure to appear at the scheduled interview. PTCO ¶ 6(7)-(8); Ex. 103.

7.   On February 15, 2007, Petitioner filed a second Form N-400 Application for Naturalization ("Application").  PTCO ¶ 5(9); Ex. 8.

8.   Petitioner passed the Naturalization Examination on November 3, 2008. PTCO ¶ 5(11).

9.   USCIS Immigration Service Officer Robert Osuna interviewed Petitioner on November 8, 2008, in connection with Petitioner's Application.

10.  On March 19, 2009, Petitioner filed a lawsuit in the U.S. District Court, Central District of California, seeking, pursuant to 8 U.S.C. § 1447(b), to compel the USCIS to adjudicate his Application.  The Court granted the relief sought and ordered the USCIS to adjudicate Petitioner's Application no later than June 15, 2009.  PTCO ¶ 6(10).

11.  The USCIS denied Petitioner's Application on June 8, 2009, on the basis that he lacked the requisite good moral character.  PTCO ¶ 5(12). Specifically, Officer Osuna denied the Application on the basis that Petitioner gave false testimony during his interview on November 8, 2008, regarding his alleged affiliation with Benevolence International Foundation ("BIF"), the identity of his last employer, and his employment status.  PTCO ¶ 5(13).

12.  Petitioner filed an "N-336 Request for a Hearing on Decision in Naturalization" ("N-336 Request") on July 13, 2008, appealing the USCIS decision denying his Application.  PTCO ¶ 5(14); Ex. 106.

13. USCIS Officers Elias Valdez and Cecil Clark interviewed Petitioner on September 24, 2009, in connection with his N-336 Request. PTCO ¶ 5(15).

14. The USCIS denied Petitioner's N-336 Request on April 8, 2010, on the basis that he gave false testimony on his application and during his interviews regarding with BIF.  PTCO ¶ 5(16)-(17).

**B.    Residence of Petitioner's Family**

15. Beginning in February 2006, Petitioner and his family lived in a house in Corona, California.  In May 2008, Ms. Carriere traveled to Cairo, Egypt with the couple's four daughters, on one-way airline tickets.  Petitioner and Ms. Carriere testified that when Ms. Carriere and the couple's daughters left, they planned to stay in Egypt for an indefinite period of time, to care for Petitioner's elderly and ailing mother and to give the Hamdi daughters an opportunity to become better-acquainted with Petitioner's family and culture.  Their departure also coincided with the U.S. economic downturn, which was affecting Petitioner's employment in the construction industry.

16. Petitioner moved from the Corona house to a small apartment in Riverside shortly after his family left for Egypt.

17. Both Petitioner and Officer Osuna testified that at the November 8, 2008, interview, Petitioner told Officer Osuna that his address had changed from Corona to Riverside, and Officer Osuna wrote the current Riverside address onto the Application.  According to Petitioner, Officer Osuna only asked him generally if everything else on the section of the Application dealing with residence was correct, and Petitioner answered that it was.  Part 9 (B) on page 6 of the Application seeks the current

address of an applicant's children; Petitioner had typed "with me" next to the name of each of his daughter's names, and the Corona address next to his wife's name.  Ex. 4.

18.  Petitioner testified that at the time of the interview, he and his wife had not decided how long she and their daughters would stay in Egypt, nor where the family would settle next; hence, they considered the visit to Egypt to be a temporary affair, and the family's permanent residence to be the place he resided, i.e., Riverside.  He also testified that at the end of his interview, he asked Officer Osuna when he would learn if his naturalization application had been approved, and when the officer responded he needed to investigate further, Petitioner volunteered that his family was then in Egypt waiting to reunite once his naturalization application was approved.

19.  Officer Osuna testified that Petitioner told him during the interview that the Corona address listed on the Application was not current, and gave his current Riverside address.  Officer Osuna testified the check mark he placed next to this section of the Application meant that he asked Petitioner where each of his daughters was living; if Petitioner had told him his daughters were then in Egypt, he would have asked more questions, including questions about how long they had been in that country.

20.  The Court finds Petitioner's testimony on this issue credible for several reasons.  At the time of the interview in 2008, Petitioner's daughters ranged in age from 14 to 19 and all were his dependents.  It would have been natural for Petitioner to consider his wife's and daughters' permanent residence to be the same as his, even if they were visiting his family for an extended period of time in another country.  Petitioner's

testimony that he asked Officer Osuna at the end of the interview about when he could expect a decision is consistent with his deposition testimony on this point.  Furthermore, Petitioner's testimony that he offered the information that he was anxious to receive a decision so he could join his family in Egypt was not inconsistent with his deposition testimony that he "asked no other questions" except those regarding the timing of an expected decision, and also is supported by Ms. Carriere's testimony that the family hoped to reunite within six months or so, as soon as Petitioner had completed the naturalization process. On the other hand, Officer Osuna admitted he conducts approximately 400 immigration interviews per year, and during his career with the USCIS had conducted over 4,000 such interviews.  The only notation Officer Osuna made on Petitioner's Application regarding the residence of his children is a checkmark; it simply is more plausible that Officer Osuna merely confirmed the information on the form, as Petitioner testified, than that he holds an independent recollection of asking in this one interview where Petitioner's wife and daughters lived.

21. Officer Osuna's credibility on this point is further undermined by his inconsistency regarding the marks he made on the Application.  He testified on direct examination that it is his practice – a practice he followed in the case of Petitioner's interview – to ask the applicant each and every question on the N-400 form, and place a check mark on the applicant's answer if there is no change; he writes in any new or changed information received during the interview.  On cross-examination, however, he admitted there were several questions on the N-400 form he had not asked Petitioner, including questions regarding his military service and affiliations with Nazi organizations, and also

1    admitted he had not put check marks in areas where he had asked
2    Petitioner the questions on the form, and had placed marks in areas
3    where he had not asked the question.

4  22.  Furthermore, even if the Court credits Officer Osuna's testimony that
5       Petitioner did not disclose – in response to a direct question – that his
6       wife and daughters were in Egypt at the time of the interview, the Court
7       finds the record contains no credible evidence that Petitioner thus
8       testified falsely for the purpose of obtaining an immigration benefit.
9       There is no evidence that the presence of his family in Egypt would
10      have affected Petitioner's Application.  As the Government admits,
11      Petitioner satisfied all the requirements for naturalization, such as five
12      years continual residence, physical presence for at least half that time,
13      lack of arrests or convictions, and lack of removal or deportability
14      proceedings or findings.  Petitioner and his wife had been married over
15      20 years at the time of the November 8 interview and their union had
16      borne four children.  Petitioner himself testified that he did not believe
17      that his family's presence in Egypt would have any bearing on his
18      Application's approval.  Thus, the Court finds Petitioner did not give
19      false testimony regarding his family's residence with the subjective
20      intent to obtain immigration benefits.

21

22  **C.   Memberships and Associations**

23  23.  Part 10 (B) of the Application requires an applicant to list all
24      organizations "or similar groups" that he has ever been a "member of"
25      or "associated with."  The Application provides no definition for any of
26      these terms.  In response to this inquiry, Petitioner listed three
27      organizations:  Al Hamra Academy elementary school in
28

Massachusetts, on whose Board of Directors he served; and two mosques where he prayed and was a member, the Islamic Society of Greater Worcester (Massachusetts) and the Islamic Society of Corona-Norco (California).  Ex. 4.  He testified during trial that he listed these organizations because he understood the terms "associated with" or "member of" to mean he had applied for membership in them, paid membership fees or dues to belong to them, or had been elected to a position with them.

24.   Petitioner and his family are practicing Muslims.  PTCO ¶ 5(4).  "*Zakat*," or the practice of charitable giving to the needy, is one of the tenets of Petitioner's Muslim faith.

25.   While living in Massachusetts during the 1990s, Petitioner contributed money to BIF, Care International ("Care"), the Bosnian Committee for Humanitarian Relief, Global Relief, and Holy Land Foundation ("HLF"), as well as other humanitarian and charitable organizations.  BIF and Care were registered charitable organizations with tax exempt status under chapter 501(c)(3) of the U.S. Internal Revenue Code at the time Petitioner donated to them.  He learned about BIF and Care when representatives of each organization came to the mosques Petitioner attended, and sought donations for humanitarian and relief work purportedly done for Muslims in Bosnia, Chechnya, and other areas affected by natural or man-made disasters.  Petitioner also helped collect contributions from other members of his mosque, and from time to time, at the request of his mosque, made announcements about Care's and BIF's fund-raising efforts.  He also assisted in those efforts by stuffing envelopes and distributing newsletters.  During the same time, Petitioner assisted other charitable organizations by, for example,

collecting and sorting goods for clothing drives for those suffering in Bosnia.  From 1998 through 2001, Ms. Carriere sponsored an orphan in Chechnya through BIF by making monthly payments of $35.00 through the couple's joint checking account.  Exs. 6, 7, 32.  When Petitioner's father died during the 1990s, Petitioner inherited approximately $200,000, and he donated some of that money to charity in keeping with the principles of zakat.  For example, in 1998, he made a $6,000 donation to Holy Land Foundation.  Ex. 9.

26.   In February, 2000, Petitioner sent a check for $8,0000 to BIF.   Ex. 8. The first check he sent for that amount was not honored by the bank, and when he learned of this, Petitioner sent a second check for the same amount, accompanied by a separate check for $50.00, also made out to BIF.  In a note he enclosed with the two checks, he wrote:

> Alsalamu alikum, Enclosed please find a check in the amount of $8000[.]  This check is to go for Chechnya Relief fund, in particular the *Injured Mujahadeen*.  This check is to replace the one I had previously sent U [sic].  Unfortunately the old check was deposited a little late and it was not honored due to lack of funds.  Find the old check under your receipt # 33606 [¶] Sorry for any inconvenience this may have caused U [sic]. I have enclosed another check in the amount of $50 to cover any expenses U [sic] may have incurred.  May Allah accept and hasten with His victory and mercy to the brothers and sisters of Chechnya.  [¶]  Jazakum Allahu khyran for your effort and [best] of salams to U [sic] all.  [¶]  Your brother in Islam, Tarek Hamdi

Ex. 8 (emphasis in original).  On the "Memo" line of the $8,000 check, Petitioner wrote:  "Chechnya Relief".  Id.

27.   Petitioner testified that shortly before he sent these funds to BIF, he had watched a televised report on CNN about current conditions in Chechnya, and the portrayal of civilian casualties, worsened by rudimentary medical care in makeshift hospitals, horrified him.  Thus, by his reference in the cover letter to "injured mujahadeen" and on the

9

1  memo line of the check to "Chechnya Relief," he intended to direct the
2  donated funds to humanitarian programs for those injured in the region.
3  He never intended that the money he sent would be used to supply
4  equipment to those fighting.

5  28.  The United States Department of the Treasury designated BIF a
6  terrorist financier on November 19, 2002.  PTCO ¶ 5(58).   One of its
7  leaders, Enaam Arnaout, pled guilty in 2003 to racketeering conspiracy,
8  based on charges he had misled donors that BIF was a charitable
9  organization devoted only to humanitarian work for refugees, when in
10  fact it supported insurgent fighting forces in Chechnya.  PTCO ¶ 5(57).

11  29.  Federal Bureau of Investigation Special Agent Michael Caputo
12  interviewed Petitioner in January, 2003, as part of the FBI's
13  investigation into BIF and its leaders, including Arnaout.  The interview
14  was an informal one, conducted at a doughnut shop near Petitioner's
15  residence in Stockton, California, and SA Caputo did not place
16  Petitioner under oath (or affirmation) before questioning him.

17  30.  When SA Caputo questioned Petitioner about his connections to BIF,
18  Petitioner initially denied making any financial contributions to the
19  organization.  Once SA Caputo showed Petitioner a copy of the two
20  checks drawn on his bank account, however, Petitioner admitted he
21  had written the checks and the note quoted above, that he had
22  collected donations from members of his mosque, as well as donating
23  some money himself, for humanitarian aid for Chechnya.  SA Caputo
24  wrote a declaration describing the information obtained from Petitioner.
25  Ex. 17.

26  31.  Petitioner did not list Care, BIF, HLF, Global Relief, or the Bosnian
27  Committee for Humanitarian Relief in Part 10 on the Application, nor

28

10

1  any other group to whom he had donated money or for whom he

2  occasionally had done volunteer work of the sort described above, but

3  had not formally joined.  Ex. 4.

4  32.  Officer Osuna testified he asked Petitioner whether he had donated

5  money to BIF and Petitioner denied doing so; Petitioner testified he did

6  not recall being asked any questions about BIF or Care during the N-

7  400 interview.  On the Application, Officer Osuna wrote only "claims no"

8  next to the section inquiring about other associations than those listed,

9  but did not write that Petitioner had denied fundraising or donating

10  money to BIF (contrary to his testimony that he always wrote down any

11  additional information received during an interview).  Moreover, in

12  Officer Osuna's decision denying Petitioner's Application, Officer Osuna

13  made no mention of this subject.  Accordingly, the Court finds

14  Petitioner's testimony on this point credible, and concludes the

15  evidence does not demonstrate that Petitioner testified falsely regarding

16  his connections to BIF or Care during the N-400 interview.

17  33.  On September 24, 2009, USCIS Officers Cecil Clark and Elias Valdez

18  interviewed Petitioner in connection with his N-336 Appeal.

19  PTCO ¶ 5(15).

20  34.  USCIS Officer Clark testified that when he asked Petitioner whether he

21  had donated funds to BIF during the N-336 interview, Petitioner initially

22  denied doing so and denied being associated with BIF; Petitioner only

23  admitted donating and doing volunteer work for the organizations when

24  Officer Clark showed him the checks and note described in paragraph

25  26, above.  Petitioner, on the other hand, testified he identified BIF as a

26  humanitarian organization when Officer Clark first asked about it, and

27  stated he initially denied donating to the organization because he did

28

1  not recall it until his memory was "refreshed" when he was shown the
2  checks and note.

3  35.  Officer Clark, like Officer Osuna, has conducted thousands of
4  immigration interviews.  He took no notes of Petitioner's N-336 hearing,
5  nor was it recorded in any manner.  Moreover, he admitted during his
6  deposition that he did not recall much about the hearing, stating only
7  that he "probably" had asked Petitioner about BIF during the hearing.

8  36.  USCIS Officer Elias Valdez also attended Petitioner's N-336 hearing.
9  According to Officer Valdez, Petitioner testified during that hearing that
10  he was not affiliated with BIF and had not donated money to it, but
11  when shown a copy of SA Caputo's declaration and the checks and
12  note, admitted he had indeed donated to and raised money for BIF.
13  Again, this testimony generally is consistent with Petitioner's own
14  testimony regarding the questioning regarding BIF at the N-336
15  hearing.  The Court finds, to the extent there is a conflict in the
16  testimony regarding the N-336 interview, Petitioner's testimony was
17  credible.  Hence, the Court concludes the evidence does not
18  demonstrate that Petitioner testified falsely regarding his connections to
19  BIF or Care during the N-336 interview, much less falsely with the intent
20  to obtain an immigration benefit.

21  37.  Taken as a whole, the evidence revealed the following connections
22  between Petitioner and BIF:

23  a.  He donated money to the organization on more than one
24  occasion;

25  b.  On one occasion, he collected donations to BIF from other
26  members of his mosque, deposited those donations into his

27

28

banking account, and sent a check for $8,000 to BIF, an amount that included his own and others' donations;

c.   At the request of others in his mosque, he made announcements and distributed newsletters or fliers regarding BIF's "relief" efforts; and

d.   Petitioner and Ms. Carriere made modest monthly financial contributions to BIF to support a Bosnian war orphan from approximately 1998 until 2001.

38.   Taken as a whole, the evidence revealed the following connections between Petitioner and Care:

a.   Petitioner donated money to Care on more than one occasion; and

b.   At the request of others in his mosque, Petitioner made announcements at his mosque regarding Care's relief efforts and assisted in those efforts on more than one occasion by stuffing envelopes with fundraising and informational literature.

39.   All of the contributions and efforts described in paragraphs 37 and 38, above, occurred before January 2002, when the U.S. government designated BIF a terrorist financier, and before 2003, when the BIF's leader pled guilty to, inter alia, fraud, racketeering and money laundering charges, alleging he had misrepresented the organizations as humanitarian and charitable ones when soliciting donations.

40.   Petitioner testified he believed his contributions to and volunteer efforts for both organizations were on behalf of charitable, humanitarian causes.  He also testified that in keeping with the Muslim practice of zakat, he made these contributions and efforts not only to BIF and Care, but also to other groups such as the Bosnian Committee for

Humanitarian Relief, Global Relief, and HLF and to individual persons in need, and submitted evidence of a $6,000 donation he made in 1998 to HLF.  Ex. 9.  In light of the credible evidence that Petitioner regularly gave money to many charitable causes and that his other efforts in connection with Care and BIF were sporadic and limited, the Court finds credible his testimony that he did not immediately remember his donation to BIF when questioned by SA Caputo during the latter's investigation of BIF, nor when questioned by Agents Valdez and Clark during the appeal interview.  Moreover, the Court finds credible Petitioner's explanation that he did not list BIF or Care on Part 10 (B) of the Application – just as he did not list the other organizations to whom he had donated money and for whom he done volunteer work – because he was not a dues-paying member, and had not applied for membership nor regularly attended meetings of the organizations.

41.  Accordingly, the Court concludes Petitioner did not give intentionally false testimony regarding his connections to BIF or Care for the purpose of obtaining an immigration benefit at any time.

## D.  Petitioner's Employment

42.  Petitioner completed the Application form on or about February 15, 2007.  On the section of the Application asking "where have you worked . . . during the last five years?," Petitioner answered that between June 28, 2005, and the time of his application he worked for Harris & Associates as a construction project engineer.  Ex. 4.

43.  In late October of 2008, Harris & Associates laid Petitioner off; Petitioner's interview with Officer Osuna took place on November 8, 2008.

14

44.  Petitioner testified that during the N-400 interview, he told Officer Osuna Harris & Associates had laid him off, and that the Officer asked no follow-up questions.  Officer Osuna gave a different account.  He testified he remembered asking Petitioner if he currently was working at Harris & Associates and that Petitioner responded "yes;" if Petitioner had revealed his unemployed status, Officer Osuna would have asked additional questions about how Petitioner would be able to support himself.  The Court finds credible Petitioner's version of this line of questioning.  First, as noted above, Petitioner has only attended one such interview – his own – and therefore is more likely to remember it clearly than Officer Osuna, who has attended thousands and thousands.  Second, Officer Osuna also testified he immediately had a "gut feeling" that Petitioner was lying about his employment, which tends to confirm Petitioner's testimony regarding the hostility he felt Officer Osuna displayed toward him throughout the interview.  Finally, Officer Osuna admitted he only placed one mark on the section containing Petitioner's employment information, although he had questions regarding the gaps in his employment.  It seems unlikely that Officer Osuna would have questioned Petitioner regarding the gaps in his employment, but yet not written anything down on the Application form regarding Petitioner's answers.  It is equally implausible that if Osuna had immediate concerns about whether Petitioner was being truthful about his employment, and the Officer had concerns about the gaps in Petitioner's employment, he would not have questioned Petitioner about those lapses in employment status.

45.  Shortly after the November 2008 interview, LAN Engineering hired Petitioner as a construction manager.

1

2  **E.     Other Issues**

3  46.    Officer Osuna testified he asked Petitioner no questions about his

4        family's prior welfare application, because in his mind "it was a dead

5        issue."  To the extent Defendants contend Petitioner gave false

6        information to anyone in the San Joaquin County, California, District

7        Attorney's office regarding his family's application for public benefits,

8        both Petitioner and Ms. Carriere testified the reason they withdrew their

9        application for such aid was their embarrassment at revealing the

10       financial assistance they had found themselves forced to accept from

11       friends when Petitioner was unemployed due to a downturn in the

12       construction industry.  The Court found this testimony sincere and

13       credible.  Thus, to the extent the negative answer to Part 22 (g) on the

14       N-400 Application can be considered "testimony," the Court finds it was

15       not made for the purpose of gaining an immigration benefit, nor were

16       any statement made by Petitioner in connection with his family's public

17       assistance application made with the requisite intent for purposes of

18       § 1101(f)(6).

19  47.    Petitioner has satisfied all of the requirements for naturalization, i.e.,

20       there have been no findings of deportability or removability against

21       Petitioner; there is no pending removal proceeding against Petitioner;

22       Petitioner has continuously resided in the United States for at least five

23       years immediately preceding the date of the filing of his application for

24       naturalization in 2007; he has not been absent from the United States

25       for more than six months from at least five years immediately preceding

26       the date of filing of his Application in 2007 until the present; Petitioner

27       has been physically present in the United States for a period totaling at

28

least half of the five years immediately preceding the date of filing his Application; and Petitioner has resided continuously in the United States from the time of his first application for naturalization to the present.  PTCO ¶ 5(18)-(55).

48.  Petitioner presented the following uncontradicted evidence of his good moral character:

    a.  His former employer, Ashraf Mohamed, supervised Petitioner during the latter's employment with LAN Engineering, where Petitioner worked as a field inspector on a large highway project. Based on his regular observations of Petitioner's work, as well as information received from Petitioner's coworkers, Mohamed testified that Petitioner was an outstanding employee in all respects:  extraordinarily diligent, honest and able.

    b.  Constance Dragon and Karen Wakeling, Petitioner's sister-in-law and niece by marriage, respectively testified that they have known Petitioner for approximately 30 years, and regard him as a devout, generous man who is a good father and husband.

**CONCLUSIONS OF LAW**

1.  The Court has jurisdiction over this action pursuant to 8 U.S.C. § 1421(c), 28 U.S.C. § 2201, and 28 U.S.C. § 1331.

2.  Petitioner resides within the Central District of California, and the events giving rise to this claim arose within this district.  Hence, venue is properly laid in the Central District.  28 U.S.C. § 1391(e)(1)(B), (C).

3.  In order to obtain the relief he seeks under the Immigration and Nationality Act ("INA"), Petitioner bears the burden of showing that he meets each of the eligibility criteria for naturalization.  <u>Berenyi v. Dist.</u>

1   Dir., 385 U.S. 630, 637 (1967);  8 U.S.C. § 1427(a).  "[I]t has been
2   universally accepted that the burden is on the alien applicant to show
3   his eligibility for citizenship in every respect. This Court has often stated
4   that doubts 'should be resolved in favor of the United States and
5   against the claimant.'"  Berenyi, 385 U.S. at 637 (quoting United States
6   v. Macintosh, 283 U.S. 605, 626 (1931) (overruled on other grounds)).

7   4.   Section 1427 of the INA sets forth the following requirements for
8       naturalization:

9       a.   An applicant must have resided continuously, as a lawful
10          permanent resident, in the United States for five years
11          immediately preceding his application to naturalize; must have
12          been physically present in the United States at least half of that
13          time, and; must have resided within the state or USCIS district in
14          which he filed his application for at least three months.
15          8 U.S.C. § 1427(a)(1); see 8 C.F.R. § 316.5.

16      b.   An applicant must reside in the United States from the time of his
17          application until the time of his "admission to citizenship."
18          8 U.S.C. § 1427(a)(2); see 8 C.F.R. § 316.5.

19      c.   An applicant must have been, and remain, "a person of good
20          moral character, attached to the principles of the Constitution of
21          the United States, and well disposed to the good order and
22          happiness of the United States."  8 U.S.C. § 1427(a)(3); see 8
23          C.F.R. § 316.10-316.11.

24  5.   Petitioner has satisfied his burden as to the first two requirements of
25      § 1427(a), i.e., he has resided continuously within the United States as
26      a lawful permanent resident for at least five years before February 15,
27      2007, the date he filed the Application, has been physically present in

28

18

1    the United States at least half of that time, has resided within California

2    for at least three months before the date he filed the Application, and

3    has resided continuously within the United States from the date of the

4    Application.

5    6.   Petitioner has satisfied his burden as to the third requirement of

6         § 1427(a), that of "good moral character," as well.  Petitioner must meet

7         this burden by a preponderance of the evidence.  United States v.

8         Hovsepian, 359 F.3d 1144, 1168 (9th Cir. 2004);

9         8 C.F.R. §§ 312.6(a)(7) and (b).  Defendants argue in vain that a "clear

10        and convincing" standard of proof applies to the good moral character

11        requirement; in Berenyi, the U.S. Supreme Court unequivocally held

12        that standard applies to the United States when it seeks to strip a

13        person of citizenship, but did not intimate it should be imposed on a

14        naturalization applicant.  The out-of-Circuit authorities Defendants cite

15        are unpersuasive, particularly in light of the clear wording of the

16        regulation and the Ninth Circuit authority cited above.

17   7.   Section 1101(f) sets out a nonexclusive list of persons who shall not be

18        regarded as having good moral character; the parties have stipulated

19        the only pertinent subparagraph of this statute is 8 U.S.C. § 1101(f)(6):

20        "one who has given false testimony for the purpose of obtaining any

21        benefits under this chapter."  The United States has conceded in

22        previous litigation that "false statements," for this purpose, include "only

23        oral statements made under oath," and not '"other types of

24        misrepresentations or concealments, such as falsified documents or

25        statements not made under oath.'"  Kungys v. United States, 485 U.S.

26        759, 780 (1988) (quoting Supp. Br. for U.S. at 3).  For purposes of

27

28

                                      19

1  § 1101(f)(6), however, a false statement need not be material.  Id. at

2  779-80.

3  8.  Petitioner is not disqualified as a person lacking "good moral character"

4  pursuant to § 1101(f)(6).  In particular:

5  (a)  Petitioner did not give "false statements" regarding his family's

6  residence; the Court found credible his testimony that his answer

7  to the question on the Application reflected the permanent

8  residence of his wife and children, despite their temporary stay in

9  Egypt caring for Petitioner's mother.[3]  Moreover, to the extent

10  Petitioner's answer to any questions during his interview with

11  Officer Osuna was inaccurate on this point, it was not an

12  intentionally "false statement" within the meaning of § 1101(f)(6)

13  for two reasons.  First, Petitioner did not answer inaccurately for

14  the purpose of gaining an immigration benefit. Petitioner testified

15  credibly that he did hold the subjective belief that the temporary

16  absence of his family from the United States would affect his

17  naturalization application, and he also testified credibly that at the

18  end of the N-400 interview with Officer Osuna he volunteered that

19  he hoped to join his family soon in Egypt.   He hardly would have

20  offered that information if he had misrepresented their permanent

21  residence in order to obtain approval of his Application.

22  Secondly, the Court finds Petitioner did not give any intentionally

23  false answer to questions about his family's residence, because

24  inadvertently inaccurate answers to vague questions do not

25

26  [3]As noted above, the term "false statement" includes only oral
   testimony given under oath.  The Court discusses Petitioner's written answers

27  because Defendants may be contending that by swearing under oath at the
   conclusion of the N-400 interview that his answers on the Application were

28  truthful, Petitioner has testified as to those answers as well.

1
2
3
4
5
6

satisfy the subjective intent required under § 1101(f)(6).  United States v. Hovsepian, 422 F.3d 883, 888 (9th Cir. 2005) ("Hovsepian II").  In other words, at most Petitioner misunderstood the inquiry on the Application form regarding the permanent residence of his wife and dependents, and therefore his answer did not constitute an intentional false statement.

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

(b)     Petitioner did not give intentionally false testimony regarding his connections to BIF or Care International.  The Court found credible and convincing Petitioner's trial testimony regarding his answer on Part 10 of the Application.  Petitioner listed three organizations he considered himself a member of or associated with, consistent with his understanding of those terms, i.e., he had some token of formal membership or association, such as dues payment, regular meeting attendance, or election to office.  This was a reasonable interpretation of the terms "membership" and "associated with,"  i.e., it was reasonable for Petitioner to conclude that "membership" and "association" did not include donations or sporadic charitable volunteer work.[4]   In any event, if Petitioner answered a vaguely worded question inaccurately, he did not do so with the requisite intent.  Hovsepian II, 422 F.3d at 887-88.  Furthermore, that Petitioner did not list the other charitable organizations in his response supports the lack of any intent to answer the question falsely.  Petitioner's answers in his

24

_____

25
26
27
28

[4]Otherwise, one who merely donated used books and magazines to a local public library, and collected like goods from friends and coworkers during an annual book drive, would be considered a "member" or "associated with" the library for the purposes of the N-400 Application form.  It is unlikely that most persons would interpret the terms "member" or "associated with" so broadly.

1   informal interview with SA Caputo do not constitute "false

2   statements" either; first, they were not given under oath.

3   Moreover, given his practice of generous charitable giving and

4   volunteer work on behalf of many humanitarian organizations, the

5   Court finds credible Petitioner's explanation that he did not at first

6   remember his contribution to BIF when asked about it by SA

7   Caputo.  Finally, the same logic applies to the sworn testimony

8   Petitioner gave during his N-336 Interview with Officers Valdez

9   and Clark; his initial response when asked about donations to BIF

10  is explicable in the context of his pattern of charitable giving to

11  many organizations.  A misstatement or inaccurate answer that

12  results from faulty memory or innocent mistake does not

13  constitute an intentionally false statement for purposes of

14  § 1101(f)(6).  Hovsepian II, 422 F.3d at 888.

15  (c)   Petitioner did not give intentionally false testimony regarding his

16  employment.  The Court found credible Petitioner's testimony that

17  he told Officer Osuna he had been laid off from his employment

18  with Harris & Associates shortly before the N-400 Interview.  See

19  supra Findings of Fact Nos. 44-45.

20  (d)   To the extent Defendants are contending Petitioner's answer to

21  Part 22 (g) on the Application constitutes "false testimony," see

22  supra Note 3, that contention lacks merit.  Officer Osuna testified

23  he asked Petitioner no questions about the prior welfare

24  application, because in his mind "it was a dead issue."  To the

25  extent Defendants contend Petitioner gave false information to

26  anyone in the San Joaquin County, California, District Attorney's

27  office regarding his family's application for public benefits, both

28

22

Petitioner and Ms. Carriere testified the reason they withdrew their application for such aid was their embarrassment at revealing the financial assistance they had found themselves forced to accept from friends when Petitioner was unemployed due to a downturn in the construction industry.  The Court found this testimony sincere and credible.  And, as the Government has conceded previously, "'It is only dishonesty accompanied by this precise intent [to obtain an immigration benefit] that Congress found morally unacceptable. Willful misrepresentations made for other reasons, such as embarrassment, fear, or a desire for privacy, were not deemed sufficiently culpable to brand the applicant as someone who lacks good moral character.'"  Kungys, 485 U.S. at 780 (quoting Supp. Br. for U.S. at 12).  Thus, to the extent the negative answer to Part 22 (g) on the Application can be considered "testimony,"  the Court finds it was not made for the purpose of gaining an immigration benefit, nor were any statement made by Petitioner in connection with his family's public assistance application made with the requisite intent for purposes of § 1101(f)(6).

For the reasons set forth above, the Court orders that judgment shall be entered in favor of Petitioner Tarek Hamdi.

Dated:  February 25, 2012

_____
VIRGINIA A. PHILLIPS
United States District Judge

23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

24